UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALMETALS, INC.,

    Plaintiff(s),

v.

WICKEDER WESTFALENSTAHL, GMBH,

    Defendant(s).
_____/

Case No. 08-10109

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [37] AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [41]**

Plaintiff Almetals, Inc. filed this action against Defendant Wickeder Westfalenstahl, GMBH. Plaintiff alleges breach of contract and anticipatory repudiation of requirements contract (Count III) and violation of Mich. Comp. Laws § 440.1203 (Count IV), and seeks relief in the form of a declaratory judgment (Count I) and specific performance (Count II). This matter comes before the Court on the parties' cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion is GRANTED IN PART AND DENIED IN PART, and Defendant's motion is GRANTED IN PART AND DENIED IN PART.

**I.**    **Facts**

Plaintiff is a Michigan corporation headquartered in Wixom, Michigan. (Pl.'s Mot. at 2.) Defendant is a German corporation located in Wickede, Germany. (*Id.*; Def.'s Mot. at 1.) Defendant produces clad metal, a composite material created by combining several layers of metal on top of one another. (*Id.*) Plaintiff purchases clad metal from Defendant

and then performs value-added services before distributing the clad metal to customers in North America, many of which are in the automotive industry. (Pl.'s Mot. at 2.)

The parties' relationship began in 1997, when they established a joint business relationship to market and sell clad metal in North America. (*Id.*) The relationship was memorialized in a contract dated April 1, 2000. (*Id.*; Def.'s Mot. at 1.) The contract represented "a seven year agreement" that could "be cancelled after seven year period, if done in writing prior to contract ending." (Pl.'s Mot., Ex. 1 at ¶ G.) The contract also contained the following provision:

> Each side realizes the time required to develop a program within the North American market and the length of time a program could run which requires a long term commitment from both parties and is the reason for the <u>ten year CUSTOMER PROTECTION clause</u>.

(*Id.* at ¶ H) (emphasis original). The Customer and Order Protection clause reads:

> In case of termination of this agreement, Wickeder agrees to protect Almetals' customers, continue to honor commitments to supply orders and complete all programs that are in developmental stages by Almetals/Wickeder for North America for a period of <u>ten years after termination of agreement.</u> Wickeder further agrees to continue to supply quality clad material at a price that allows Almetals to be profitable and competitive as negotiated for the previously mentioned orders and programs. Customers are defined as: those that Almetals has sold clad materials to in the past, is currently selling to or is developing a program with. Orders are defined as: clad material being supplied by Wickeder to Almetals for a specific customer with a long term part. Programs are defined as: a project to develop or sell clad material to a specific customer that has correspondence between Almetals and Wickeder.

(*Id.* at ¶ I.)

During the initial seven-year term of the contract, Plaintiff had the exclusive right to sell Defendant's clad metal in North America (with limited exceptions), and Defendant was required to supply such material. (*Id.* at ¶ C.) The contract also set forth a number of other

2

essential terms to govern the parties' relationship; these included pricing ("negotiated prices . . . that will make Almetals competitive in the North American marketplace") and payment terms ("sixty days after receipt of material at an Almetals plant").[1]  *(Id.* at ¶ ¶ E, K.)

In February 2006, in accordance with the contract's termination policy, Defendant notified Plaintiff that it intended to terminate the contract on March 31, 2007.  (Pl.'s Mot., Ex. 2; Ex. 1 at ¶ G.)  Defendant acknowledged that it was bound by the Customer and Order Protection Clause and agreed to "honor [it] in accordance with its terms."  (*Id.* at Ex. 3.)  Defendant also wrote, "if you would like to place any specific clad material orders for delivery after March 31, 2007, at this time we will review and process same and send you our prices and payment terms."  (*Id.*)

After the contract terminated on March 31, 2007, Defendant insisted on different payment terms: 60 days after *invoice* (as opposed to the previous term of 60 days after receipt of the material).[2]  (Pl.'s Mot. at 5; Def.'s Mot. at 3.)  This reduced the time for Plaintiff to pay by approximately 45 days.  (Pl.'s Mot. at 5.)  In return, Defendant offered a .5% price reduction.  (*Id.*; Def.'s Mot. at 3.)  On June 4, 2007, Defendant's counsel sent a letter to Plaintiff that laid out the new payment terms and stated, "I hope this will finally clarify and once and for all settle the commercial terms of future purchase transactions between our clients."  (Pl.'s Mot., Ex. 5.)  Plaintiff agreed to the terms (under protest,

---

[1] Plaintiff asserts that payment 60 days after receipt is consistent with standard practice in the automotive industry.  (Pl.'s Mot. at 5.)

[2] Defendant asserts that this change was predicated upon its concern "about the large Almetals receivable that Wickeder routinely carried on its books," which typically was more than $1 million.  (Def.'s Mot. at 2 n.2.)

3

according to Plaintiff), and the parties continued to conduct business together. (Pl.'s Mot. at 5; Def.'s Mot. at 3.)

On November 12, 2007, Defendant again attempted to change the payment terms, this time requiring that Plaintiff pay cash on delivery ("COD") in exchange for a 1% price reduction on future orders. (Pl.'s Mot., Ex. 6.) Plaintiff claims that if the COD terms are allowed to take effect, "Almetals would suffer extreme financial hardship. More specifically, even with all available credit sources, Almetals would quickly run out of funds to operate its business." (Pl.'s Mot., Ex. 8 at ¶ 7.) Plaintiff also asserts that it cannot stop buying clad metal from Defendant because "there is no alternative source of supply." (Pl.'s Mot. at 6.) Defendant counters that "Almetals has an improved economic and accounting profit under the newly required COD payment term coupled with the 1% price reduction." (Def.'s Mot., Ex. D at ¶ 9) (emphasis original). Defendant also argues that Plaintiff could use other "suppliers for at least some, if not all, of the clad metal it supplies to its customers." (Def.'s Resp., Ex. A at ¶ 5.)

Plaintiff initiated this lawsuit in Oakland County Circuit Court on December 20, 2007. (Docket Text # 1.) Defendant removed the case to this Court on January 8, 2008. (*Id.*) On January 17, 2008, the Court granted Plaintiff's motion for a temporary restraining order. (Docket Text # 9.) The TRO requires the parties to abide by the "60 days from invoice" payment terms until further order of the Court. (*Id.*) On March 6, 2008, the Court granted Plaintiff's motion to consolidate the preliminary injunction hearing and the trial on the merits, and the Court kept the TRO in place until the consolidated hearing takes place. (Docket Text # 31.) The consolidated hearing is set to begin on May 14, 2008. This matter is now before the Court on the parties' cross-motions for summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56© mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

Both parties agree that their relationship is now governed by the Customer and Order Protection Clause ("the Clause"); they differ, however, with respect to what terms are encompassed by the Clause. The Sixth Circuit recently set forth the principles of contract interpretation under Michigan law:

> A court's primary responsibility in construing a Michigan contract is to ascertain and enforce the intent of the parties. The court examines the contract as a whole, giving effect to all parts and language of a written agreement according to their ordinary and natural meaning. . . . If the parties' intent is unambiguously clear from the language of the written agreement, the court must enforce the parties' intent as expressed in the writing.

*Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001) (internal citation and punctuation omitted). Further, "contracts must be construed consistent with common sense and in a manner that avoids absurd results." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 545 (6th Cir. 2007) (citation omitted).

### A. Breach of Contract

Plaintiff's first substantive claim is for breach of contract and anticipatory repudiation of requirements contract. This claim relates to Defendant's attempt to impose new payment terms with respect to Plaintiff's purchase of clad metal. Plaintiff makes three distinct arguments regarding the payment terms: 1) that the entire contract was incorporated into the Clause; 2) alternatively, that Defendant is bound by the terms set forth in Defendant's letter of June 2007; and 3) that COD terms are commercially unreasonable and are therefore barred by the UCC. The Court will address each argument in turn.

### 1. The Contract Was Not Incorporated into the Clause

Plaintiff's first argument is that the payment terms from the contract (60 days from receipt) are incorporated into the Clause; therefore, Plaintiff argues, Defendant's attempt to impose different payment terms is a breach. The Court disagrees. Plaintiff posits that "it is obvious that the intent of the Customer and Order Protection Clause is to continue the supply relationship on the same general terms" that existed before the contract was terminated. (Pl.'s Mot. at 11.) Plaintiff's argument, essentially, is that because "none of the essential details of the parties' relationship spelled out elsewhere in the Contract are restated in the Clause," the entire contract was "obviously intended to remain in effect." (*Id.*) The fatal flaw in Plaintiff's position is that the Clause does contain an "essential detail of the parties' relationship" – the Clause specifically sets forth a price term: "Wickeder further agrees to continue to supply quality clad material at a price that allows Almetals to be profitable and competitive as negotiated for the previously mentioned orders and programs." (Pl.'s Mot., Ex. 1 at ¶ I.) This is similar to the price term that governed while the contract was operational: "Almetals will purchase the material from Wickeder at negotiated prices for applications that will make Almetals competitive in the North American marketplace." (*Id.* at ¶ E.)

The parties' choice to include a price term in the Clause illustrates that when they intended to include specific terms in the Clause, they did so. The parties, however, chose not to include any payment terms in the Clause. And as the initial contract made clear, the parties considered payment terms to be separate and distinct from price terms. (*See Id.*

at ¶ ¶ E, K.) The Court therefore concludes that the parties did not intend to incorporate the contract's payment terms into the Clause.[3]

This determination is not at odds with the Sixth Circuit's instruction that "the intention of the parties is to be gathered from the entire instrument and not from detached portions." *Fla. Can. Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193, 195-96 (6th Cir. 1960). It is undisputed that the initial contract was terminated on March 31, 2007. The only provision to survive the contract was the Clause. Thus, the "entire instrument" in this case is the Clause itself, not the initial contract in its entirety. To hold otherwise would render meaningless paragraph H in the initial contract, which provided that "either party may terminate this agreement upon twelve months written notice." (Pl.'s Mot., Ex. 1 at ¶ H.) Plaintiff is therefore correct when it asserts that Defendant "wants to ignore everything in the Contract but the Customer and Order Protection Clause." (Pl.'s Mot. at 6.) Defendant's position is sound, though, since everything but the Clause was terminated in March 2007.

Plaintiff's final effort to establish that the entire contract was incorporated in the Clause is to look to the parties' course of dealing. *See Cooke Contracting Co. v. State*, 217 N.W.2d 435, 438 (Mich. App. 1974) (looking at course of dealing to determine parties' intent). Plaintiff suggests that the payment terms found in the contract "governed the parties [sic] relationship for more than a decade and continued in effect even after the

---

[3]Contrary to Plaintiff's assertion, Defendant has not "acknowledged that all of the material terms of the Contract have remained in effect since the [Clause] began governing the parties' relationship, with the exception of joint efforts aimed at long-term marketing . . . and the payment terms that [Defendant] is seeking to change." (Pl.'s Mot. at 11.) Rather, Defendant responded to Plaintiff's interrogatories by listing 11 different ways in which the post-contract relationship has varied from the terms of the Contract. (Pl.'s Mot., Ex. 4 at 4-5.) A number of these changes have nothing to do with marketing or payment terms.

Contract was terminated." (Pl.'s Resp. at 9.) The first half of this statement is accurate, although when the terms of the contract governed the relationship, the contract was still in effect. With respect to the parties' post-termination relationship, Defendant informed Plaintiff as early as March 13, 2007, that it intended to change the terms to 60 days from invoice. (Def.'s Resp., Ex. D at Ex. 1 at 2.) The parties then engaged in fairly extensive correspondence regarding the new terms, most of which was directed to the issue of whether payment by check would be accepted. (*Id.*) In a letter dated April 26, 2007, less than a month after the termination of the contract, Almetals wrote, "Almetals will also comply with your new requirement of payment within 60 days of invoice instead of 60 days from receipt of material." (*Id.* at 9.) Thus, Defendant informed Plaintiff that it intended to change the "course of dealing" even before the contract was terminated, and Plaintiff agreed to do so within a month of the contract's termination. If the payment terms found in the contract continued to govern the parties' relationship after March 31, 2007, it was only for a very short time and only because of Plaintiff's delay in accepting the new terms.

The parties' course of dealing, therefore, does not support Plaintiff's contention that the contract payment terms were incorporated into the Clause. Defendant insisted on new terms before the contract was terminated, and Plaintiff acquiesced in short order.

Ultimately, were Plaintiff's position correct, the result would be "absurd" – Defendant's termination of the contract would not have changed the parties' relationship in any way, and its sole effect would have been to lock into place the terms of the contract for an additional ten years. Given that the initial contract was for a seven year period, the Court does not

believe this result was envisioned or intended by the Clause.[4]  The Court therefore concludes that contractual provisions that were not explicitly set forth in the Clause were not intended to be incorporated by reference.  Accordingly, the payment terms from the contract do not govern the parties' relationship under the Clause, and Defendant did not breach the Clause when it imposed new payment terms.

### 2. Defendant is Bound by the Terms of the June 2007 Letter

Plaintiff argues in the alternative with respect to whether the parties are bound by the terms set forth in Defendant's letter of June 2007.  First, Plaintiff argues it is not bound by those terms because it accepted them under duress; alternatively, Plaintiff argues that the parties are bound by the terms in the letter.  The Court rejects Plaintiff's duress argument, but agrees that the terms in the June 2007 letter are binding on the parties.

"In Michigan, to succeed on a claim of duress and avoid an otherwise valid contract, Plaintiff must establish that it was illegally compelled or coerced to act by fear of serious injury to it, its reputation, or its fortune."  *Whirlpool Corp. v. Grigoleit Co.*, No. 1:06-195,

---

[4]The Court rejects Plaintiff's argument that Defendant looks at the contract as a whole. This argument is premised upon Defendant's reference to the contract's choice-of-law provision. (Pl.'s Resp. at 8; Def.'s Mot. at 3 n.3.)  First, Defendant does not cite the provision to support its argument; rather, Defendant notes that while Michigan law applies to this case, the contract simply stated that it "will be ruled by the laws of the Untied States of America."  (Def.'s Mot. at 3 n.3.)  Further, Michigan law applies to this case notwithstanding the choice-of-law provision. *Wonderland*, 274 F.3d at 1092 (Michigan law applies to diversity action filed in a Michigan district court).  Accordingly, Defendant's alleged reliance on the contract's choice-of-law provision is of no consequence.
    The only other instance where Defendant allegedly "looked to the contract as a whole" occurred when Defense counsel referenced the contract's forum selection clause at oral argument. (Pl.'s Resp. at 8.)  Again, this provision has no effect on this case, for the Court has personal jurisdiction over Defendant by way of Michigan's long-arm statute.

2006 WL 1997402, *3 (W.D. Mich. July 13, 2006) (citations omitted).  Plaintiff has not suggested that its agreement to new payment terms was the product of illegal conduct by Defendant, and "[f]ear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully."  *Id.* (citing *Apfelblat v. Nat'l Bank Wyandotte-Taylor*, 404 N.W.2d 725, 728 (Mich. App.1987)). Accordingly, Plaintiff's duress argument fails.[5]

The Court now must determine whether the parties are bound by the terms set forth in Defendant's June 2007 letter.   Again, both parties concede that the Clause constitutes a binding contract.  And while the Clause does not contain a payment term:

---

[5] Plaintiff relies on *Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F. Supp. 794, 797 (E.D. Mich. 1990), for the proposition that an *improper* threat (rather than illegal conduct) is all that is required to make out a claim of duress.  That decision, however, ignored Michigan Supreme Court precedent and instead predicted how that court would rule if it were to revisit the issue.  *Id.* at 797 n.5.  This is contrary to the Supreme Court's holding in *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. . . . Congress has no power to declare substantive rules of common law applicable in a state . . . [a]nd no clause in the Constitution purports to confer such a power upon the federal courts.") Moreover, the Michigan Supreme Court has never backed away from its holding that "[d]uress exists when one by the *unlawful* act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will." *Hackley v. Headley*, 8 N.W. 511, 512-13 (Mich. 1881) (emphasis added).  Indeed, the illegality requirement has been repeated by the Michigan Court of Appeals since the *Kelsey-Hayes* opinion was issued.  *See, e.g., Farm Credit Servs. of Mich.'s Heartland, P.C.A. v. Weldon,* 591 N.W.2d 438, 447 (Mich. App. 1998)*; Enzymes of Am. v. Deloitte, Haskins & Sells,* 523 N.W.2d 810, 814 (Mich. App. 1994) (*rev'd in part on other grounds*) ("Illegality is an element of duress."). Accordingly, the Court finds that the *Whirlpool* court properly determined that Plaintiff must show illegality to succeed on a claim of duress.

> A contract, including a written contract, may be modified orally or in writing. The modification must be by mutual consent. The mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract.

*Kloian v. Domino's Pizza L.L.C.*, 733 N.W.2d 766, 771 (Mich. App. 2006) (internal citations omitted) (holding that parties consented to modify contract based on an e-mail exchange).

Defendant first attempted to change the payment terms in a letter dated February 27, 2007, where it wrote that "payment will be due within 60 days after the date of invoice rather than the 60 days after receipt of merchandise by Almetals for all future orders." (Def.'s Resp., Ex. D at Ex. 1 at 2.) Plaintiff objected to these terms in a March 19, 2007 letter (*id.* at 3), and Defendant again reiterated that the terms would "be applicable to Almetals after March 31, 2007" in a letter dated March 27, 2007. (*Id.* at 4.) Plaintiff acquiesced and informed Defendant, in an April 26, 2007 letter, that "Almetals will also comply with your new requirement of payment within 60 days of invoice instead of 60 days from receipt of material." (*Id.* at 9.) On June 4, 2007, Defendant again wrote that "all future orders and subsequent purchase transactions" would be subject to the 60 days from invoice payment terms. (*Id.* at 17.) Defendant also stated that the purpose of the letter was to "finally clarify and once and for all settle the commercial terms of future purchase transactions between" the parties. (*Id.*) Plaintiff responded that it "underst[ood] and accept[ed] the terms outlined in your letter." (*Id.* at 18.)

This correspondence represents "clear and convincing evidence" of a "mutual agreement" to modify the terms of the Clause. Defendant argues that the June 2007 letter was not intended to commit Defendant "to any permanent payment terms," but "simply concluded a slew of correspondence between the parties on various issues." (Def.'s Resp.

12

at 8.) Defendant then boldly asserts that the letter actually established that the payment terms "were fluid – subject to change at [Defendant]'s discretion." (*Id.*) Defendant cites no authority to support its position, nor does it cite to any language in the correspondence between the parties. Instead, Defendant offers the declaration of the attorney who wrote the letters, Hans-Michael Kraus. (Def.'s Resp., Ex. D.) Mr. Kraus states, "Neither my letter of June 4, 2007, nor the specific language contained therein, was intended to bind Wickeder to permanent terms." (*Id.*) Nonetheless, "[i]f the parties' intent is unambiguously clear from the language in the written agreement, the court must enforce the parties' intent *as expressed in the writing*." *Wonderland*, 274 F.3d at 1092 (emphasis added).

Defendant informed Plaintiff that payment for *all future orders* would be due 60 days from invoice, reiterated the terms, and responded to Plaintiff's acceptance of the terms by reemphasizing that *all future orders* were subject to the new terms. Defendant even wrote that it intended to "finally clarify and once and for all settle the commercial terms of future purchase transactions between" the parties. (Def.'s Resp., Ex. D. at Ex. 1 at 17.) There is no ambiguity in this language, and the Court therefore rejects Defendant's assertion that there is a "fact question . . . as to what was meant by the language used in the . . . letter." (Def.'s Resp. at 8-9.) Accordingly, Defendant is bound by the payment terms expressed in the June 2007 letter.

Because Defendant is bound by those terms and is now attempting to impose new payment terms on Plaintiff, Plaintiff's motion for summary judgment with respect to its breach of contract claim (Count III) is GRANTED.

### B. UCC

Plaintiff's second claim is that Defendant violated Mich. Comp. Laws § 440.1203, which represents Michigan's codification of the UCC. Defendant also makes an argument under the UCC. Both parties' arguments are foreclosed by the Court's ruling that the parties are bound by the terms set forth in Defendant's June 2007 letter. Plaintiff argues that Defendant's proposed COD terms violate the UCC because they are commercially unreasonable and not imposed in good faith. (Pl.'s Mot. at 12.) Plaintiff makes no such argument with respect to the terms that require payment 60 days from invoice; in fact, Plaintiff states that those terms "were negotiated in good faith and are commercially reasonable." (*Id.* at 14.) Because those terms govern the parties' relationship, Plaintiff's argument under the UCC must fail. Accordingly, Defendant's motion for summary judgment with respect to Count IV of Plaintiff's complaint is GRANTED.

Defendant, for its part, argues that the UCC's gap filler, Mich. Comp. Laws § 440.2310, applies and that COD terms are therefore appropriate. (Def.'s Mot. at 6.) That provision only applies when the parties have not agreed upon other terms; the entire statute is prefaced by the clause "unless otherwise agreed." Here, the parties agreed to payment terms. As a result, the gap filling provision does not apply.

### C. Requested Relief

Plaintiff has requested two forms of relief: a declaratory judgment (Count I), and a permanent injunction that requires Defendant to specifically perform the contract through March 31, 2017 (Count II). The Court will address Plaintiff's specific performance claim first.

#### 1. Specific Performance

"A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and that it is in the public's interest to issue the injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (citation and internal quotation marks omitted). Under Michigan law, "[t]he remedy of specific performance is an extraordinary one granted only in unusual cases to prevent irreparable harm. It is a matter of grace and not of right." *Barbers Local 552 v. Sealy*, 118 N.W.2d 837, 839 (Mich. 1962). In this context, "irreparable harm" is synonymous with "inadequate remedy at law." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 584 (6th Cir. 2007) (interpreting Michigan law). Michigan law specifically authorizes specific performance "where the goods are unique or in other proper circumstances." Mich. Comp. Laws § 440.2716. Comment 2 to this provision clarifies that "inability to cover is strong evidence of 'other proper circumstances.'"

Here, Plaintiff argues it is entitled to specific performance because it will suffer irreparable harm if injunctive relief is not granted. Plaintiff's argument rests on two bases. First, Plaintiff argues that if Defendant imposes COD terms, Plaintiff "will be forced to cease operations." (Pl.'s Mot. at 16.) While an injunction generally is not available to prevent financial harm, "[t]he impending loss or financial ruin of [Plaintiff]'s business constitutes irreparable injury. . . . [I]rreparable injury has been characterized as loss of a movant's enterprise." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995). In support of its position, Plaintiff offers the affidavit of its President, James M. Chain, who states that if COD terms were imposed, Plaintiff "would quickly lack funds to continue to operate. The resulting damages would be immeasurable, but would include

15

loss of reputation and goodwill, business opportunities, and enormous liability to our customers." (Pl.'s Mot., Ex. 9 at ¶ 5.)

Defendant counters with the "second declaration" of proposed expert witness S.A. De Kock, who states that "Almetals has an <u>improved</u> economic and accounting profit under the newly required COD payment term coupled with the 1% price reduction." (Def.'s Mot., Ex. D at ¶ 9) (emphasis original). Whether Plaintiff will be forced to shut down under COD terms is clearly material to the question of irreparable harm. As both parties have submitted competent and contradictory evidence with respect to this issue, summary judgment is not appropriate.

Plaintiff's second argument with respect to irreparable harm is that "the clad metal at issue is highly unique and is not available from any other source." (Pl.'s Mot. at 16.) Plaintiff offers no competent evidence (or any evidence at all) in support of this proposition, but instead simply cites to its complaint. (*Id.*) Indeed, when Plaintiff discusses the "undisputed evidence" with respect to the availability of clad metal, Plaintiff cites Defendant's witness. (Pl.'s Resp. at 14.) That witness, Defendant's director of sales Rainer Theile, states in a declaration that Defendant:

> is not the sole producer of clad metal in the world. Other producers of clad metal include Auerhammer (Germany) and Nippon Steel (Japan). Thus, Almetals could turn to these and other suppliers for at least some, if not all, of the clad metal it supplies to its customers if it were unwilling to buy such product from Wickeder.

(Def.'s Mot., Ex. A at ¶ 5.)

Because Plaintiff has offered no contradictory evidence, no issue of fact exists with respect to this issue. Nonetheless, because a genuine issue of material fact exists with

respect to Plaintiff's first irreparable harm argument, the parties' motions for summary judgment with respect to this claim are DENIED.

### D. Declaratory Judgment

Plaintiff also requests a declaratory judgment. The Declaratory Judgment Act, 28 U.S.C. §2201(a), provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Plaintiff requests two separate declaratory judgments. For the reasons set forth in this opinion, the Court GRANTS Plaintiff's first request and declares that Wickeder's imposition of COD terms is a violation of the parties' contract. Plaintiff's second request is DENIED, as the Court will not declare that Plaintiff is entitled to specific performance of the terms set forth in the June 2007 letter.

## IV. Conclusion

For the above-stated reasons, Plaintiff's motion for summary judgment is GRANTED with respect to Count III, is GRANTED IN PART AND DENIED IN PART with respect to Count I, and is DENIED with respect to Counts II and IV. Defendant's motion for summary judgment is GRANTED as to Count IV and is DENIED with respect to Counts II and III.

                                              s/Nancy G. Edmunds  
                                              Nancy G. Edmunds  
                                              United States District Judge

Dated: May 12, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 12, 2008, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager