UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALMETALS, INC.

        Plaintiff,                          Case No. 08-10109

v.

                                    Hon. Nancy G. Edmunds

WICKEDER WESTFALENSTAHL, GMBH

        Defendant.

                                    /

**OPINION AND ORDER GRANTING PERMANENT INJUNCTION**

Plaintiff Almetals, Inc. ("Almetals") filed this action against Wickeder Westfalenstahl GmbH ("Wickeder") to prevent irreparable harm from Wickeder's imposition of cash-on-delivery ("COD") payment terms on Almetals.

On January 17, 2008, the Court issued a temporary restraining order preventing Wickeder from imposing COD terms. (Docket Text #9.)

Following cross-motions for summary judgment, on May 12, 2008, the Court issued a declaratory judgment in favor of Almetals, holding that "Wickeder's imposition of COD terms is a violation of the parties' contract." (Docket Text #53 at 17; Trial Tr. vol. 1, 16.)

A bench trial was held on May 14-15, 2008, for the purpose of determining whether Almetals is entitled to a permanent injunction specifically enforcing the Court's ruling for the duration of the Customer and Order Protection Clause of the parties' contract. The following Findings of Fact and Conclusions of Law support the relief of specific performance.

## I. FINDINGS OF FACT

### A. The Parties

#### 1. Almetals

1. Plaintiff Almetals is a Michigan corporation headquartered in Wixom, Michigan. (Trial Tr. vol. 1, 23.)

2. Almetals provides distribution and other services for metals in the automotive and other industries. (Trial Tr. vol. 1, 24.)

#### 2. Wickeder

3. Defendant Wickeder Westfalenstahl GmbH ("Wickeder") is a German Corporation located in Wickede, Germany. (Trial Tr. vol. 2, 29.)

4. Wickeder is a global supplier of semi-finished clad materials, including clad metal. (Trial Tr. vol. 2, 6.)

Wickeder is the industry leader in clad metal. (Trial Tr. vol. 2, 39.)

### B. Clad Metal

5. Clad metal is a combination of different metallic layers which are mechanically bonded together to form a composite material that retains the properties of the individual component metals. (Trial Tr. vol. 1, 27; Trial Tr. vol. 2, 6.)

6. The clad metal that Wickeder provides Almetals is steel or stainless steel "cladded" with another metal, such as aluminum, copper, brass, or nickel. (Trial Tr. vol. 1, 28; Pl.'s Ex. 101/Def.'s Ex. 501, ¶ A.)

7. The different types or specifications of clad metal are nearly endless because of the many variables that go into the manufacturing process. (Trial Tr. vol. 1, 28, 119-20.)

8. Not every clad metal producer can manufacture clad to all of the possible specifications. (Trial Tr. vol. 1, 50, 120.)

9. A particular specification of clad metal may be unique because particular variables are difficult to manufacture. (Trial Tr. vol. 1, 49-50.)

10. The clad metal that Wickeder supplies to Almetals is "unique." (Trial Tr. vol. 1, 61.)

**C. The Contractual Relationship Between Almetals and Wickeder**

    **1. The Formation of the Relationship**

11. In 1997, Almetals and Wickeder first established a joint business relationship to sell and market clad metal in North America. (Trial Tr. vol. 1, 30.)

12. The parties' most recent contract, dated April 1, 2000 ("Contract"), granted Almetals the exclusive right to sell Wickeder's clad metal in North America (with limited exceptions) and required Wickeder to supply such product. (Trial Tr. vol. 1, 34; Pl's Ex. 101/Def.'s Ex. 501, ¶ C.)

13. Almetals purchases clad metal from Wickeder and then performs value-added services (including slitting, recoiling, inspection, labeling, warehousing and logistics) before distributing the clad metal to customers in North America. (Trial Tr. vol. 1, 41-42.)

    **2. The Customer and Order Protection Clause**

14. Almetals and Wickeder recognized that it would take a considerable length of time and substantial investment to develop clad metal sales in the North American market. (Trial Tr. vol. 1, 31-32; Pl.'s Ex. 101/Def.'s Ex. 501.) For example, it took nearly six or seven years for Almetals to develop the use of Wickeder's clad metal for a particular fuel-cell program that is now expected to last up to ten years. (Trial Tr. vol. 1, 37-38.)

15. Almetals spent a substantial amount of money developing a market for Wickeder's clad metal in North America. (Trial Tr. vol. 1, 32, 34, 36-37.)

16. Almetals and Wickeder also realized that once the customers began using clad metal in long-term programs, the customers would require that specific clad metal for the duration

of the program. (Trial Tr. vol. 1, 32, 50-51, 118.)

17. Accordingly, the Contract was for a term of seven years and included an additional ten-year commitment for existing customer orders and programs under what was called the Customer Order and Protection Clause. (Trial Tr. vol. 1, 33-34; Pl.'s Ex. 101/Def.'s Ex. 501, ¶¶ G-I.)

18. Under the Customer Order and Protection Clause, Wickeder agreed "to protect Almetals' customers, continue to honor commitments to supply orders and complete all programs that are in developmental stages by Almetals/Wickeder for North America for a period of <u>ten years after termination of agreement</u>." (Pl.'s Ex. 101/Def.'s Ex. 501, ¶ I (emphasis in original)).

19. The theory behind the Customer Order and Protection Clause was that it would provide a period of winding down of the business for existing customers and projects, although no new business would be developed during that time. (Trial Tr. vol. 1, 34-35.)

**D. Almetals' Clad Metal Customers**

20. Almetals' efforts to market Wickeder's clad metal in the United States have been hugely successful. Almetals initially purchased a few hundred thousand dollars worth of clad metal from Wickeder, but in 2008 its purchases may reach eight or nine million dollars. (Trial Tr. vol. 1, 40-41.)

21. Currently, approximately 40 percent of Almetals' sales come from clad metal supplied by Wickeder. (Trial Tr. vol. 1, 63.)

22. The clad metal that Wickeder supplies to Almetals is used for heat shields, bearings, transmissions, oil coolers, and cylinder-head gaskets. (Trial Tr. vol. 2, 7.)

23. Almetals' clad metal customers include BorgWarner, Dana Corporation, Lydell, Fuel Cell Energy, and Modine. (Trial Tr. vol. 1, 40.)

4

24.  Most of Almetals' customers are in the automotive industry which relies on the just-in-time supply of materials. (Trial Tr. vol. 1, 43, 197-98.)

25.  Most of Almetals' customers require Almetals to carry at least 16 weeks of inventory to protect against any interruption in the just-in-time supply. (Trial Tr. vol. 1, 41-43.)

26.  Once an Almetals customer decides to obtain clad metal from a particular source for a long-term program, it is difficult to change the source due to the requirements of the Production Part Approval Process ("PPAP"), which requires extensive testing of sources of supply. (Trial Tr. vol. 1, 50-51, 213.)

27.  Moreover, programs are built around a specific type of clad metal such that another material cannot be easily substituted. (Trial Tr. vol. 1, 38, 117.)

E.  **Wickeder's Termination of The Contract and Imposition of COD**

28.  In 2000, Wickeder purchased a metal distributor in the United States, which could replace Almetals as a distributor for Wickeder's clad metal in the United States. (Trial Tr. vol. 1, 82-83; Trial Tr. vol. 2, 8-9, 35-36.)

29.  Sometime around 2005, Wickeder approached Almetals about purchasing Almetals' business, but no sale was ever consummated. (Trial Tr. vol. 1, 83.)

30.  Then, in early 2006, Wickeder notified Almetals that it was terminating the Contract for new business, effective March 31, 2007. (Trial Tr. vol. 2, 45.)

31.  Around the same time, Wickeder also purchased its closest competitor, Engineered Material Solutions ("EMS"), which was formerly a division of Texas Instruments. (Trial Tr. vol. 1, 58; Trial Tr. vol. 2, 9.)

32.  Following the termination of the Contract, Wickeder began imposing increasingly oppressive payment terms on Almetals for the existing business that survived under the

Customer Order and Protection Clause. First, in June 2007, the payment terms were changed from 60 days after receipt of the material to 60 days after invoice. (Trial Tr. vol. 1, 80; Docket Text #53 at 3-4 (Order ruling that June 2007 payment terms are in effect)).

33. Then, on November 12, 2007, Wickeder sent a letter to Almetals imposing COD terms, in exchange for a 1% price reduction. (Trial Tr. vol. 1, 81; Pl.'s Ex. 102.)

34. COD is not common practice for long-term manufacturing contracts, especially in the automotive industry. (Trial Tr. vol. 1, 84, 197.)

35. Almetals has always paid Wickeder on time – even through the bankruptcies of its customers such as Delphi, Federal Mogul and Dana – and there was no change in Almetals' financial condition to warrant the imposition of COD terms. (Trial Tr. vol. 1, 66-68, 84, 205-09.)

36. Financially, Almetals is doing better than many suppliers in Southeast Michigan today, and it does not appear to be in any financial distress, but for the imposition of the COD. (Trial Tr. vol. 1, 167-190.)

37. Wickeder does not claim that COD terms are necessary for the continuation of its business. (Trial Tr. vol. 2, 35.)

**F. There Is No Alternative Source for the Unique Clad Metal that Wickeder Supplies to Almetals**

38. The clad metal Almetals purchases from Wickeder is "unique." (Trial Tr. vol. 1, 61.)

39. Wickeder has always been the sole source of supply for the clad metal that Almetals purchases its customers. (Trial Tr. vol. 1, 44, 51-52.)

40. There are no other suppliers in the world known to make the clad metal that Almetals purchases from Wickeder. (Trial Tr. vol. 1, 51-52.)

**1. Almetals and Its Customers Have Unsuccessfully Searched for an Alternative Source of Supply Since 1997**

41. Almetals, like many companies, has a policy that requires an alternative source of supply for the material that it needs for its business. (Trial Tr. vol. 1, 52, 121.)

42. Over the years, Almetals' customers, such as Dana Corporation, have also requested that Almetals find an alternative source of supply for the clad metal that Almetals purchases from Wickeder. (Trial Tr. vol. 1, 55-56.)

43. Since 1997, Almetals has tried, but has been unable to find an alternative source to supply the clad metal that it purchases from Wickeder. (Trial Tr. vol. 1, 52, 58, 121.)

44. Although a few companies have claimed that they can manufacture the unique clad metal that Almetals purchases from Wickeder, not a single one has actually been able to do so. (Trial Tr. vol. 1, 54, 56, 129.)

45. Since 1997, Almetals' customers have tried, but have been unable to find an alternative source to supply the clad metal from Wickeder. (Trial Tr. vol. 1, 122.) In fact, Dana Corporation tried to replace Wickeder with another supplier because Dana was frustrated by price increases, but it could not find an alternative source of supply. (Trial Tr. vol. 1, 55-56, 122.)

### 2. Wickeder Purchased the Most Promising Alternative Source of Supply and Terminated Discussions

46. Following Wickeder's notification that it was terminating the Contract for new business, effective March 2007, Almetals increased its efforts to obtain an alternative source of supply for the clad metal supplied by Wickeder. (Trial Tr. vol. 1, 125.)

47. As part of its increased efforts, Almetals engaged in discussions EMS, Wickeder's closest competitor, to explore if EMS could develop the capability to manufacture clad metal to the necessary specifications. (Trial Tr. vol. 1, 57-58, 124-26.)

48. Although EMS was not currently manufacturing the type of clad metal that

Almetals purchases from Wickeder, discussions with EMS were very promising and it was the best hope of an alternative source of supply. (Trial Tr. vol. 1, 57-58, 124-26.)

49. Then, in the Fall of 2007, EMS abruptly terminated discussions with Almetals because Wickeder purchased EMS. (Trial Tr. vol. 1, 57-58, 124-26.)

### 3. Since Wickeder Has Sought To Impose COD, Almetals Has Undertaken Extensive Efforts To Find An Alternative Source of Supply, All of Which Have Been Unsuccessful

50. In recent months, Almetals has researched and contacted more than 25 clad metal manufacturers, including all of the companies suggested by Wickeder as possible alternative sources of clad metal during this litigation, requesting a quote for the specific clad metal that Almetals purchases from Wickeder. (Trial Tr. vol. 1, 127; Pl.'s Ex. 105.)

51. No other company in the world, including any of those suggested by Wickeder, currently produces the clad metal that Wickeder supplies to Almetals. (Trial Tr. vol. 1, 61, 127-33; Trial Tr. vol. 2, 37-39.)

52. The majority of the manufacturers recently contacted have stated that they are unable to manufacture the clad metal to the required specifications, or they have failed to respond to the request for quotation, even though it was sent by fax or email and certified mail. (Trial Tr. vol. 1, 11; Pl.'s Ex. 105.)

53. No other company has been able to provide a quote for, let alone produce, any of the clad metal that Almetals' customers require, with the exception of one company (Auerhammer) which provided a limited quote to try to manufacture one type of clad metal, which amounts to either .2% or .3% of the clad metal that Almetals purchases from Wickeder. (Trial Tr. vol. 1, 60, 131, 138.)

54. Even Wickeder has admitted that there is no possible alternative source of supply

8

for 40% of the business and, with regard to the remaining 60% of the business, it does not know of another supplier currently making the product nor whether another supplier can actually make the product. (Trial Tr. vol. 2, 37-39.)

### G. "COD" Payment Terms Will Cause Irreparable Harm to Almetals

55. The Court has ruled that Wickeder's imposition of COD is a breach of the Contract. (Docket Text #53.)

56. Wickeder has indicated that it may choose to disregard the Court's ruling and breach the Contract. (Trial Tr. vol. 2, 31, 34-35.)

57. Payment terms from Wickeder which allow time for payment are essential for Almetals due to the time lag before it receives payment from its customers. (Trial Tr. vol. 1, 44-45.) Because Almetals must maintain an inventory of clad metal to satisfy its contracts with customers, Almetals does not receive payment from its customers for the clad metal that it supplies from Wickeder until up to 150 days after Almetals receives the material from Wickeder. (Trial Tr. vol. 1, 45-46, 109.)

58. Even Wickeder's expert admits that Wickeder's imposition of COD will cause Almetals to suffer a $1.1 million cash-flow "hit", which, taking into account all current cash and credit sources, will result in a negative cash flow of approximately $600,000. (Pl.'s Ex. 108, Trial Tr. vol. 1, 181-86; Trial Tr. vol. 2, 59.)

59. A negative cash flow means that Almetals will have no cash to operate its business. (Trial Tr. vol. 1, 87-88.)

60. In other words, COD will cause Almetals to become insolvent because it will not be able to pay its debts as they become due. (Trial Tr. vol. 1, 158-59, 178, 185.)

61. Hence, Wickeder's insistence on COD terms will likely put Almetals out of business. (Trial Tr. vol. 1, 89.)

9

62. The negative cash flow would be permanent because it is not just an issue of timing. (Trial Tr. vol. 1, 86-87, 179, 182, 209.)

63. COD terms could also damage Almetals' reputation and possibly other vendors would follow suit which would put Almetals in a negative cash flow position even more quickly. (Trial Tr. vol. 1, 91-92, 189.)

64. The 1% price reduction offered by Wickeder in exchange for COD terms would likely offset the cost of borrowing funds, but does nothing to solve the problem of cash flow. (Trial Tr. vol. 1, 90, 186, 212.)

65. Almetals has a very favorable $8 million credit line with Comerica Bank that is secured by all of Almetals' assets, as well as a guarantee from Chain Industries, the parent company of Almetals. (Pl.'s Ex. 104; Trial Tr. vol. 1, 73-74, 170, 200-01; Trial Tr. vol. 2, 77.)

66. Almetals has no source of additional financing to make up for the cash shortfall that will result from the imposition of COD. Almetals has never refused additional financing and there is no other source of credit in the marketplace that would increase the total dollars available to Almetals to run its business. (Trial Tr. vol. 1, 79-80, 172, 203.)

67. The solutions proposed by Wickeder's expert to rectify the cash flow shortage that will result from COD are not viable in light of the current state of the auto industry in Southeast Michigan.

**H.    An Injunction Will Not Harm Wickeder**

68. An injunction will require that Wickeder follow the Court's ruling as to the terms of the Contract.

69. A TRO has been in place since January 17, 2008, requiring Wickeder to abide by the same contractual terms that the Court has found to be in effect, and Wickeder has not claimed any resulting harm.

70. Wickeder has insured its receivables from Almetals up to 2.5 million euros, or $3.8 to 3.9 million, an amount nearly three and one-half times greater than the amount owed by Almetals to Wickeder at any time in the parties' business relationship, which is, on average, $1.1 or 1.2 million. (Pl.'s Ex. 106; Trial Tr. vol. 1, 71-72; Trial Tr. vol. 2, 21.)

71. There has been no material change in Almetals' financial condition that would warrant a change to COD terms, and in fact, both Wickeder's insurer and Almetals' lender have increased their credit limits with regard to Almetals. (Trial Tr. vol. 1, 68, 71, 74, 84.)

72. Almetals has paid Wickeder on time, even through the bankruptcies of Delphi, Dana, and Federal Mogul, as well as the American Axle strike. (Trial Tr. vol. 1, 66-67, 206-07.)

73. According to Wickeder, Almetals is only a very small percentage of Wickeder's business. (Trial Tr. vol. 2, 26.)

**I.     An Injunction is in the Public Interest**

74. If Wickeder imposes COD, then Almetals will be out of business and at least twenty-five employees will lose their jobs. (Trial Tr. vol. 1, 91.)

75. If Wickeder is not prohibited from imposing COD terms on Almetals, then Almetals will be unable to supply clad metal to its customers. (Trial Tr. vol. 1, 61, 127-33.)

76. Even if Wickeder were to replace Almetals with its wholly-owned U.S. distributor as appears to be Wickeder's plan, the supply of clad metal to customers still will be at least temporarily disrupted because of the ship-time from Germany, the logistics of changing distributors, and problems associated with the production approval process. (Trial Tr. vol. 1, 92, 213.)

77. In fact, early in the contractual relationship, Wickeder attempted to ship directly to Almetals' customers, but this did not work. (Trial Tr. vol. 1, 41.)

## II. CONCLUSIONS OF LAW

### A. Michigan Law Applies

78. The substantive law of Michigan applies. (Pl.'s Ex. 101/501, ¶ M.) *See Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001) (state law applies in diversity action filed in a Michigan district court).

### B. Almetals Is Entitled to an Order Requiring Wickeder to Comply With the Court's Ruling

79. Almetals is entitled to an order requiring Wickeder to abide by the Court's ruling as to the payment terms (60 days after invoice of the materials in exchange for a .5% price discount) for the duration of the Customer and Order Protection clause for two independent reasons: (1) Almetals has met the test for specific performance under the UCC; and (2) Almetals has met the common-law test for a permanent injunction.

#### 1. Almetals Is Entitled to Specific Performance Under the UCC

80. The power to grant specific performance rests within the discretion of the court. Under Michigan law, "[t]he remedy of specific performance is an extraordinary one granted only in unusual cases to prevent irreparable harm. It is a matter of grace and not right." *Barbers Local 552 v. Sealy*, 118 N.W.2d 837, 839 (Mich. 1962).

81. The UCC authorizes specific performance of contracts involving unique goods or in other proper circumstances:

> (i) Specific performance may be decreed where the goods are unique or in other proper circumstances.
>
> (ii) The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.

MICH. COMP. LAWS § 440.2716.

82. Michigan has also adopted Comment 2 from the 1962 official text to UCC § 2-

716, which states that:

> Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation . . . [U]niqueness is not the sole basis of the remedy under this section for the relief may also be granted "in other proper circumstances" and inability to cover is strong evidence of "other proper circumstances."

83. The UCC is consistent with the common law in which specific performance is well-recognized as an appropriate remedy where goods are unique or scarce. *Jaup v. Olmstead*, 55 N.W.2d 119, 120 (Mich. 1952) ("Generally, specific performance is not decreed where the subject-matter of the contract is personalty. However, if the specific property is not obtainable on the market and damages will not provide adequate compensation, equity may take jurisdiction"); *In re Smith Trust*, 745 N.W.2d 754, 756 (Mich. 2008) ("Because real property is unique . . . specific performance is the proper remedy"); 71 Am. Jur. 2d *Specific Performance* § 175 (2008); *Bohnsack v. Detroit Trust Co.*, 290 N.W. 367 (Mich. 1940) (ordering specific performance of agreement among shareholders to buy life insurance to benefit surviving shareholders).

84. Indeed, under UCC § 2-716, "a more liberal test in determining entitlement to specific performance has been established than the test one must meet for classic equitable relief." *Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 442-43 (S.D. Fla. 1975) ("In the circumstances, a decree of specific performance becomes the ordinary and natural relief rather than the extraordinary one").

85. Specific performance under UCC § 2-716 is the appropriate remedy because the varieties of clad metal supplied by Wickeder pursuant to the parties' requirements contract are unique and there are no known alternative sources of supply, but only speculation as to a possible alternative source for .2% or .3% of the product. *Sherwin Alumina L.P. v. Aluchem, Inc.*, 512 F.Supp.2d 957, 960 n. 2, 970 (S.D. Tex. 2007) (applying UCC § 2-716 and ordering specific

performance of a contract to supply calcined alumina, a scarce product, where the supplier had "very few competitors," "there [was] only one other manufacturer of [the product] in North America," and the buyer needed the products for its business to survive).

### 2. Almetals is Entitled to a Permanent Injunction

#### a. The Injunction Standard

86. A court considers the following factors in deciding whether to exercise its discretion to grant permanent injunctive relief: (1) whether irreparable injury would result without the injunction for which there is no adequate remedy at law; (2) whether "considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (3) whether the public interest is served by the issuance of an injunction. *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (citation and internal quotation marks omitted).

87. The need for injunctive relief is particularly strong here where, despite the Court's declaratory judgment that Wickeder's imposition of COD terms is a breach of the Contract, Wickeder still refuses to agree to abide by the Court's ruling. See *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) (requiring "clear proof" that conduct has been abandoned to avoid injunctive relief).

#### b. All Factors Weigh in Favor of the Issuance of a Permanent Injunction

##### (i) Almetals Suffers Irreparable Harm for Which There is No Adequate Remedy at Law

88. An injunction is appropriate where a case involves "the kinds of injury for which monetary damages are difficult to calculate." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992)).

89. COD terms will have a severe immediate and continuing impact on Almetals' cash

14

flow such that it will have a negative cash flow and insufficient funds to operate its business, even with all available sources of cash and credit. Hence, Almetals will suffer irreparable harm if Wickeder is not prohibited from imposing COD because it faces "impending loss or financial ruin" of a business. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (holding that while an injunction generally is not available to prevent financial harm, it is available in the unique case where a plaintiff's business is threatened with insolvency. Otherwise, further litigation would become "meaningless or hollow"); *Doran v. Salem Inn, Inc.* 422 U.S. 922, 932 (1975) (threat of bankruptcy constitutes irreparable injury); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 924 (6th Cir.1978) ("[I]rreparable harm may be established by" "proof of . . . severe financial hardship" that causes plaintiff's business to be "completely wiped out.")

90. In addition, Almetals faces irreparable harm because there is no alternative source of supply for all of the clad metal that it is contractually required to supply to its customers in the automotive and other industries. Accordingly, damages will be incalculable and irremediable. *TRW, Inc. v. Indus. Sys. Assoc., Inc.*, Nos. 01-3134, 01-3196, 2002 WL 31205397, *1 (Oct. 2, 2002, 6th Cir. 2002) (affirming injunction and finding irreparable harm where "automakers could not readily obtain air bags from a second source if [plaintiff] were to fail to supply them" and plaintiff "will lose good will, and its business relations with existing and future business prospects will be undermined"); *Jaup*, 55 N.W.2d at 120 ("Generally, specific performance is not decreed where the subject-matter of the contract is personality. However, if the specific property is not obtainable on the market and damages will not provide adequate compensation, equity may take jurisdiction"); *In re Smith Trust*, 745 N.W.2d at 756 ("Because real property is unique . . . specific performance is the proper remedy"); 71 Am. Jur. 2d *Specific Performance* § 175 (2008); *Bohnsack*, 290 N.W. at 369 (ordering specific performance of

agreement among shareholders to buy life insurance to benefit surviving shareholders). *See also Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp*, 749 F. Supp. 794, 798 n. 7 (E.D. Mich. 1990) (noting that by ceasing to provide goods under a just-in-time requirements contract, an automotive supplier may inflict incalculable injury); *In re Autostyle Plastics, Inc.*, 216 B.R. 784, 788 (Bankr. W.D. Mich. 1997) ("Because [Debtor] was a "single source" supplier to General Motors Corporation (among others), it feared that any interruption in its production schedules might result in a shut down of certain assembly lines while GM and other customers obtained new suppliers and made the necessary arrangements for new production tooling and dies. In turn these shut downs might cause the layoff of innumerable employees of GM and Debtor's other customers.").

91. There is further evidence of irreparable harm in that the unwarranted imposition of COD terms will cause immeasurable injury to Almetals' reputation. *Chem-Trend, Inc. v. McCarthy*, 780 F. Supp. 458 (E.D. Mich. 1991) (granting preliminary injunction, stating that "injury to a company's goodwill constitutes irreparable injury"); *Cutler-Hammer, Inc. v. Universal Relay Corp.*, 285 F. Supp. 636, 639 (S.D.N.Y. 1968) ("Since injuries to reputation are not readily recompensed by money damages, the harm caused may well be irreparable. A preliminary injunction is warranted under these circumstances").

92. These are damages for which there is no adequate remedy at law. *TRW, Inc.*, 2002 WL 31205397, at *1 (affirming injunction and finding irreparable harm where "automakers could not readily obtain air bags from a second source if [plaintiff] were to fail to supply them" and plaintiff "will lose good will, and its business relations with existing and future business prospects will be undermined").

93. Finally, in light of the procedural history of this case in which Almetals has tried to

avoid legal process by virtue of its existence as a German corporation – coupled with its stated intention to perhaps disregard this Court's ruling – there is no adequate remedy at law for Almetals.

94. This case is distinguishable from *Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592 (E.D. Mich. 2008), for a number of reasons:

> First, this is not merely a situation in which a supplier is unjustifiably increasing its prices. Wickeder's imposition of COD terms is tantamount to a refusal to supply because the evidence is undisputed that Almetals cannot pay COD terms due to the impact of COD on its cash flow. *See Eberspaccher*, 544 F. Supp. 2d at 603 ("Although ENA alleged that it cannot afford to pay Van-Rob's increased prices, it failed to provide concrete evidence.") In other words, it is not possible for Almetals to give in to Wickeder's demands and sue for damages. *See id.* ("ENA can pay Van-Rob its requested prices and pursue a breach of contract action against Van-Rob for money damages.")

> Second, this action involves undisputed evidence that there is no alternative source of supply for the material. It is not a situation in which Almetals will suffer only a temporary interruption in the source of supply. *See id.* at 594 ("ENA states . . . it cannot obtain an alternative muffler supplier soon enough to avoid supply interruptions.").

> Third, it is undisputed that the imposition of COD will cause the insolvency of Almetals for which there is no adequate remedy at law. *See id.* at 603 ("A party's harm is 'irreparable' when it cannot be adequately compensated by money damages.")

### (ii) The Balance of Hardship Tips in Almetals' Favor

95. Wickeder will not be harmed by the Court issuing a permanent injunction requiring it to abide by the payment terms as determined by the Court's May 12, 2008 order.

96. The Court issued a TRO on January 17, 2008, and there has been no suggestion that the TRO has harmed Wickeder.

97. Wickeder also will not be harmed by COD because the Almetals account receivable is more than adequately insured. (Pl.'s Ex. 106.)

98. The balance of hardships tips decidedly in Almetals' favor because Almetals faces the insolvency of its clad metal business. *See e.g., Zurn Constructors, Inc. v. BF Goodrich Co.,* 685 F.Supp. 1172, 1182 (D. Kan. 1988) (granting preliminary injunction to buyer where "plaintiff's potential loss of its entire business outweighs defendant's potential lost profits and its being forced to alter its corporate strategy").

### (iii) Granting an Injunction is in the Public Interest

99. The public interest would be particularly advanced by the issuance of an injunction. An injunction in this case would keep all of the affected businesses operating. Denying the injunction places at risk the operations at Almetals, and, correspondingly, numerous customer assembly plants. This would be disastrous, irreparably damaging Almetals' business and reputation, and causing further detriment to the economy. Additionally, the public interest is served by requiring Wickeder to abide by its contractual agreement. *See Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 551 ("Enforcement of contractual duties is in the public interest").

## III. Conclusion

For the above-stated reasons, this Court grants Plaintiff a permanent injunction, requiring specific performance by Defendant of the June 2007 contract terms for the duration of the

Customer and Order Protection Clause of the parties' contract.

                              <u>s/Nancy G. Edmunds</u>
                              Nancy G. Edmunds
                              United States District Judge

Dated: October 29, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 29, 2008, by electronic and/or ordinary mail.

                              <u>s/Carol A. Hemeyer</u>
                              Case Manager